2003-NMCA-123

79 P.3d 830

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Joseph McDONALD, Defendant–
Appellant.**

No. 22,689.

Court of Appeals of New Mexico.

July 30, 2003.

Certiorari Granted, No. 28,237,
Oct. 10, 2003.

Patricia A. Madrid, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, NM, for Appellee.

John B. Bigelow, Chief Public Defender, Sheila Lewis, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

BUSTAMANTE, Judge.

{1} Defendant appeals from a judgment and sentence entered after a jury found him guilty of armed robbery and conspiracy to commit armed robbery. The jury had deadlocked on Count I, involving felony murder and the lesser-included offense of second degree murder, and the respective conspiracy counts. The district court thereafter ruled that the failure to poll the jury resulted in an "implied acquittal" of the felony murder and conspiracy to commit felony murder charges. The district court denied Defendant's motion to bar retrial of the remaining counts and Defendant filed a separate appeal from this order. We consolidated the appeals and now address the following issues: (1) whether the district court properly sentenced Defendant under NMSA 1978, § 31–18–15(A)(2), (4) (1999), both of which provisions require a finding that the crime resulted "in the death of a human being"; (2) whether Subsections 31–18–15(A)(2) and (4) constitute an "enhanced sentence" that may not be further enhanced by other sentencing statutes; (3) whether conspiracy is a crime subject to reduced good time credit; and (4) whether retrial on conspiracy to commit murder is barred because the evidence supports only one conspiracy.

{2} After this case was assigned to the general calendar, the State moved to sever the appeals and dismiss the appeal from the order addressing retrial. We hereby deny the motion. We affirm as to issues two and four and reverse on issues one and three.

## FACTUAL AND PROCEDURAL BACKGROUND

{3} Defendant and Lorenzo Mora were accused of robbing and killing Anthony Baldenegro, an out-of-state truck driver who had stopped at a bar in Lordsburg on the evening of September 24, 1999. The State introduced evidence that Defendant and Baldenegro had been drinking for a while before Defendant's girlfriend, Onisha Aguilera, arrived at the bar with a female friend. The two women, Defendant, and Baldenegro all proceeded toward Aguilera's apartment. At some point prior to going to Aguilera's apartment, drugs were obtained. There was also evidence presented that Defendant obtained a syringe and a knife. Defendant and Baldenegro were dropped off near Aguilera's apartment, and Aguilera joined them later after her friend had gone home.

{4} Defendant and Aguilera were given money by Baldenegro and left the residence to purchase more drugs; they were unable to find any and returned to the apartment to find Baldenegro asleep. Defendant and Aguilera left again and ended up at the house of Lorenzo Mora's mother, where they consumed more drugs until Mora arrived. Defendant and Mora went back to Aguilera's apartment to get more money from Baldenegro. Although there is a factual dispute with respect to any alleged decision to physically harm Baldenegro, the State presented evidence that Defendant and Mora intended to forcibly take money from Baldenegro, if necessary. The evidence also indicated that Defendant picked up a large metal pipe and gave it to Mora upon their arrival at the apartment. Mora entered the bedroom

where Baldenegro was still sleeping, with Defendant entering through the kitchen. Mora then hit Baldenegro with the pipe, fracturing his skull twice and causing his death some hours later. Defendant took Baldenegro's money and wallet and the two fled to Mexico, along with Aguilera, later that morning. The three were arrested ten days later as they tried to re-enter the country.

{5} Defendant was charged by criminal information with an open count of murder (Count I), conspiracy to commit murder (Count II), armed robbery (Count III), and conspiracy to commit armed robbery (Count IV). At trial the jury was presented conflicting versions with respect to Defendant's role in the killing. Mora, who had previously pled guilty to second degree murder, testified that he alone was responsible for the robbery and killing, and that Defendant was in the kitchen and rushed in to stop Mora. The State relied in part on prior inconsistent statements made by Mora that implicated Defendant in the robbery and killing. With respect to Count I, the case was submitted to the jury with instructions that it could find Defendant guilty of felony murder, guilty of the lesser-included offense of second degree murder, or not guilty. These alternatives were also submitted for the accompanying conspiracy count, Count II. The jury hung on Counts I and II, but returned guilty verdicts on Count III, armed robbery, and Count IV, conspiracy to commit armed robbery. The district court declared a mistrial on Counts I and II, but did not poll the jury.

{6} The district court sentenced Defendant to the fifteen-year basic sentence authorized by Section 31–18–15(A)(2) for the armed robbery conviction. With respect to the conspiracy to commit armed robbery conviction, the district court likewise applied the basic sentence of six years for a third degree felony that resulted in death. *See* § 31–18–15(A)(4). The district court found that each of these counts should be enhanced by one-third based on aggravated circumstances. Defendant admitted to two prior felonies, and the district court accordingly added four additional years to each count. The court ran all sentences consecutively, for a total commitment of thirty-six years. The court

also found that "this is a serious violent offense" that would affect the amount of earned meritorious deductions, or good time credit, available to Defendant. The court subsequently ruled that Defendant could not be retried on the felony murder and the conspiracy to commit felony murder counts because of the failure to poll the jury on these counts. The court ruled that Defendant could be retried on the lesser-included offenses of second degree murder and conspiracy to commit second degree murder.

## DISCUSSION

### I. The "Resulting in Death" Finding

{7} Defendant posits two reasons why he should not have been sentenced for crimes resulting in the death of a person under Subsections 31–18–15(A)(2) and (4). First, he asserts the district court was barred by collateral estoppel from making the requisite factual finding because he was impliedly acquitted on the felony murder count (Count I) when the jury hung on Counts I and II and then was discharged without being polled. Second, he argues that under *Apprendi v. New Jersey*, 530 U.S. 466, 477, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the jury and not the judge had to make the factual finding that the crime resulted "in the death of a human being." We hold that *Apprendi* applies to this part of our sentencing statute. Thus, we do not have to resolve the issues raised by Defendant's first alternative theory.

{8} In *Apprendi*, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348. Grounded in Sixth Amendment concerns for jury fact finding, the message of *Apprendi* is that punishment is circumscribed by the jury verdict. The district court is not allowed to make new fact findings at the sentencing stage which serve to increase the basic sentence applicable to the crime found by the jury. Thus, in *Apprendi*, the Court reversed an enhanced sentence imposed on the trial judge's post-verdict finding that the defen-

dant had acted with racial bias. *Id.* at 477 n. 3, 120 S.Ct. 2348.

{9} We have addressed the effect of *Apprendi* on New Mexico's sentencing scheme twice. *State v. Morales,* 2002–NMCA–016, ¶ 1, 131 N.M. 530, 39 P.3d 747 (holding *Apprendi* did not preclude trial judges from determining whether an offense is a "serious violent offense" for purposes of setting a defendant's good time credit ratio); *State v. Wilson,* 2001–NMCA–032, 130 N.M. 319, 24 P.3d 351 (Bustamante, J., concurring in part and dissenting in part). In *Wilson* we held that *Apprendi* did not render unconstitutional Section 31–18–15.1(A), "which requires the sentencing court to hold a hearing to determine whether aggravating . . . circumstances warrant a departure from the basic felony sentences set forth in [Section] 31–18–15." *Wilson,* 2001–NMCA–032, ¶¶ 1, 4, 130 N.M. 319, 24 P.3d 351.

{10} Our rationale in *Wilson* was that "Sections 31–18–15 and 31–18–15.1 should be read together to provide for a range of sentences, and that sentencing within this range . . . is constitutional" because there is no danger that the trial judge's decision can increase the maximum punishment which could be imposed based on the jury's verdict. *Id.* ¶¶ 4, 16–17. The State essentially asserts that the decision under Section 31–18–15 whether the basic sentence can be increased because a crime "resulted in death" is indistinguishable from the decision whether to aggravate sentence under Section 31–18–15.1

{11} We disagree. First, *Wilson* addressed the ability of district courts to adjust sentences up or down within a given range based on historically well-established aggravating or mitigating factors. The range for any given sentence is dependent on the basic sentence determined under Section 31–18–15(A). *Wilson* did not address in any way the impact of *Apprendi* on the determination of the basic sentence applicable to a given crime following a jury verdict.

{12} Subsections 31–18–15(A) provides a clear and marked (six years) distinction between the basic sentence for a "plain" second degree felony and the basic sentence for a second degree felony resulting in a death. The difference in the basic sentence between a "plain" third degree felony and a third degree felony resulting in death is three years. § 31–18–15A. The fact of death caused by the crime thus acts as a trigger to increase the applicable basic sentence materially beyond that set for the underlying felony. In this sense, "resulting in death" elevates the seriousness of the crime and operates in effect as an element of the crime. As we recognized in *Wilson,* this consequence requires that the basic sentence-enhancing fact be submitted to and decided by the jury. 2001–NMCA–032, ¶¶ 27–28, 130 N.M. 319, 24 P.3d 351.

{13} The State argues that, even assuming *Apprendi* applies, the error of not having the jury decide if the crime resulted in death is harmless because the evidence in favor of the judge's finding is overwhelming. *See State v. Padilla,* 2002–NMSC–016, ¶ 22, 132 N.M. 247, 46 P.3d 1247. This argument might have some force if the jury had made a finding that Defendant was culpable for the victim's death in some other aspect of the case. But, it did not. In fact, the jury failed to convict Defendant of any of the charged crimes which would have held him directly culpable for the victim's death.

{14} In this sense, this case is different from *United States v. Friedman,* 300 F.3d 111 (2d Cir.2002), upon which the State relies. In *Friedman,* the Second Circuit decided that the *Apprendi* error at trial was harmless because under the applicable statute and on the evidence in the record, "no reasonable jury could have found the [defendants] guilty beyond a reasonable doubt of the ITAR crimes—as the jury in this case did—and simultaneously found that the [defendants] were not responsible for the deaths." *Friedman,* 300 F.3d at 128.

{15} Here, the jury in fact failed to find Defendant guilty of felony murder or second degree murder and their accompanying conspiracy counts. To find that Defendant's acts in connection with the more attenuated armed robbery resulted in the victim's death is not consistent with the jury's failure to find him guilty of the death directly. The jury's failure to convict Defendant of a crime that would have found him responsible for

the death argues against the district court's action and brings into clear relief the constitutional underpinnings of *Apprendi*.

{16} *State v. Shije*, 1998–NMCA–102, 125 N.M. 581, 964 P.2d 142 is not to the contrary. In *Shije*, the defendant pled guilty to second degree murder, contributing to the delinquency of a minor and conspiracy to commit murder. *Id.* ¶ 3. The defendant in *Shije* was sentenced to fifteen years on the murder charge and an additional fifteen years on the conspiracy charge. *Id.* The defendant theorized on appeal that conspiracy could not be considered a felony resulting in death because, as an initiatory crime, it was complete upon agreement. *Id.* ¶ 5. We pointed out that Section 31–18–15(A)(2) does not require that the death occur in the commission of the crime. *Id.* ¶ 6. We also saw no difficulty in concluding that the crime resulted in death when the defendant admitted he "agreed to kill and then proceeded to kill." *Id.* ¶ 7. We also rejected the theory of the defendant in *Shije* that Section 31–18–15(A) was limited by definition to crimes which explicitly included "resulting in death" as a statutory element. *Shije*, 1998–NMCA–102, ¶¶ 8–9, 125 N.M. 581, 964 P.2d 142. Thus, Shije simply did not address the issue we decide here.

{17} Similarly, the other cases cited by the State following *Shije* do not address the *Apprendi* issue we resolve today. For example, *State v. Guerro*, 1999–NMCA–026, ¶ 11, 126 N.M. 699, 974 P.2d 669, simply followed the holding in *Shije* that the absence of the "resulting in death" language from a criminal statute—there the vehicular homicide statute—did not preclude sentencing under Section 31–18–15(A)(2). *State v. Alvarado*, 1997–NMCA–027, ¶¶ 10–11, 123 N.M. 187, 936 P.2d 869 narrowly held that the increased sentence under Section 31–18–15(A)(4) was not a violation of double jeopardy principles. *Alvarado* did not address in anyway the *Apprendi*-based issue of who must make the finding that a crime has resulted in a death.

## II. Alleged Double Enhancement

{18} Defendant maintains that he was subject to an impermissible "double enhance-

ment," first under the increased sentencing authority under Subsections 31–18–15(A)(2) and (4), and then an additional one-third of the basic sentence based on a finding of aggravating circumstances under Section 31–18–15.1. Defendant refers us to three cases in support of this claim. All three of these cases involve the use of a prior conviction to support an element of a subsequent conviction, and also used to support enhancement under our habitual offender statute. In *State v. Keith*, 102 N.M. 462, 463–65, 697 P.2d 145, 146–48 (Ct.App.1985), this Court held that a prior armed robbery conviction that was used to increase a subsequent armed robbery conviction from a second degree felony to a first degree felony could not thereafter be used to enhance under the habitual offender statute. Similarly, in *State v. Haddenham*, 110 N.M. 149, 151–54, 793 P.2d 279, 281–84 (Ct.App.1990), we held that a prior felony could not be used to satisfy an element of the felon in possession conviction, and thereafter be used for habitual offender enhancement. More recently, in a case reminiscent of *Keith*, we concluded that a prior trafficking conviction that was used to raise the degree of a subsequent crime could not be used to impose a habitual offender enhancement also. *State v. Lacey*, 2002–NMCA–032, ¶¶ 5–16, 131 N.M. 684, 41 P.3d 952.

{19} It is evident that these cases do not support Defendant's argument, because there is no dual use here of a prior conviction or factual predicate. In *State v. Peppers*, 110 N.M. 393, 400–01, 796 P.2d 614, 621–22 (Ct. App.1990), this Court observed that *Keith* and *Haddenham* have a limited scope in that they merely prohibit double use when the same fact is used as (1) an element of the crime and a subsequent enhancement, or (2) as the basis for two separate enhancements. In *Peppers*, the defendant relied on *Keith* and *Haddenham* to argue that his failure to appear conviction could not be enhanced under the habitual offender statute. *Peppers*, 110 N.M. at 400–01, 796 P.2d at 621–22. We concluded that the defendant failed to satisfy either ground set forth above. *Id.* Similarly here, any alleged dual use of a prior conviction is not at issue, and the same fact (death

of the victim) was not used for both enhancements. Specifically, the district court based the finding of aggravating circumstances on evidence that this was not a spur of the moment crime, that Defendant lured the intoxicated victim into a trap, that he sought assistance in his efforts, that Baldenegro was sleeping when he was attacked, and that Defendant made no attempt to seek medical attention and went off to buy and use more drugs while the victim slowly bled to death. In the absence of the type of dual use discussed in *Keith* and its progeny, we conclude that the legislature has authorized both enhancements under the basic sentencing statute and on the finding of aggravating circumstances. *See Lacey*, 2002–NMCA–032, ¶ 5, 131 N.M. 684, 41 P.3d 952 (holding issue ultimately is one of legislative intent).

### III. Good Time Credit

{20} We agree with Defendant's claim that the district court was not authorized to limit his good time credit for the conspiracy to commit armed robbery conviction. We also agree with Defendant that any alleged problems with preservation do not affect our review, because we are considering the legality of the sentence. A district court does not have jurisdiction to impose an illegal sentence because its power to sentence is "derived exclusively from statute." *State v. Martinez*, 1998–NMSC–023, ¶ 12, 126 N.M. 39, 966 P.2d 747. Because the issue concerns subject matter jurisdiction, it cannot be waived and can be raised at any time. *State v. Davis*, 1998–NMCA–148, ¶ 9, 126 N.M. 297, 968 P.2d 808.

{21} Turning to the merits, the relevant statutory authority, NMSA 1978, § 33–2–34 (1999), which we will refer to as the Earned Meritorious Deductions Act (EMDA), authorizes up to thirty days of credit per month for nonviolent offenders, but limits credit to four days per month for prisoners who have been convicted of a serious violent offense. The statute defines a serious violent offense in two ways. First, there are thirteen enumerated offenses that satisfy the definition as a matter of law. § 33–2–34(L)(4)(a)—(m). Second, the statute lists thirteen additional offenses that may trigger the EMDA's good time credit reduction provisions. § 33–2–34(L)(4)(n). Here, Defendant's armed robbery conviction falls within the mandatory portion of the statute, Section 33–2–34(L)(4)(g), and we therefore only need to address whether conspiracy to commit armed robbery is subject to a credit reduction under the EMDA.

{22} In *Morales*, 2002–NMCA–016, ¶¶ 12–18, 131 N.M. 530, 39 P.3d 747, this Court looked at the structure of the EMDA and concluded that the list of thirteen discretionary crimes indicated a legislative acknowledgment that these enumerated crimes could be committed in ways that might or might not constitute a serious violent offense. As such, "the legislature wanted to reserve the serious violent offenses for those found by the trial judge to be committed in a physically violent manner either with an intent to do serious harm or with recklessness in the face of knowledge that one's acts are reasonably likely to result in serious harm." *Id.* ¶ 16. Conspiracy to commit armed robbery is not listed as one of the crimes that might satisfy this definition under Section 33–2–34(L)(4)(n). Nevertheless, the State argues that the offense was carried out in a manner that would satisfy the legislative intent for reduced good time credit under the EMDA. In effect, the State's reading of the statute would allow a seemingly endless number of offenses to come under the spirit of the EMDA, so long as they satisfied the test set forth in *Morales*.

{23} The State's argument runs afoul of at least two basic rules of statutory construction. First, we do not read additional language into a statute when it makes sense as written. *See State v. Gutierrez*, 102 N.M. 726, 730, 699 P.2d 1078, 1082 (Ct.App. 1985). As observed in our discussion in *Morales*, 2002–NMCA–016, ¶¶ 12–18, 131 N.M. 530, 39 P.3d 747, the legislature appears to have carefully structured the EMDA to automatically trigger credit reduction for certain offenses, and for a limited number of offenses to qualify as well under certain circumstances. Second, and put another way, when interpreting a statute, a reviewing court does not depart from the plain wording of a statute, unless it is necessary to resolve

an ambiguity, correct a mistake or an absurdity that the Legislature could not have intended, or to deal with an irreconcilable conflict among statutory provisions. *State ex rel. Helman v. Gallegos,* 117 N.M. 346, 351–52, 871 P.2d 1352, 1357–58 (1994).

### IV. Conspiracy

■ {24} Finally, Defendant contends that he may not be retried on the conspiracy to commit second degree murder charge because the evidence supported only one agreement. *Cf. State v. Post,* 109 N.M. 177, 181, 783 P.2d 487, 491 (Ct.App.1989) (noting that lack of sufficient evidence bars retrial). Although the State claims that the jury has merely deadlocked here and therefore Defendant is not able to review this issue now, this portion of his appeal is from the denial of the motion to dismiss retrial on double jeopardy grounds. Because the issue is directly reviewable, we consider the merits of the claim in this appeal. *See State v. Apodaca,* 1997–NMCA–051, ¶ 9, 123 N.M. 372, 940 P.2d 478. We apply a "sufficiency-of-evidence" analysis, in which we look at the facts in the light most favorable to the State and indulge in all favorable inferences to support a determination that more than one agreement is supported by the evidence. *State v. Reyes,* 2002–NMSC–024, ¶ 20, 132 N.M. 576, 52 P.3d 948.

{25} Defendant claims that there was no view of the evidence to support an agreement to commit murder and an agreement to rob Baldenegro. We disagree. As pointed out by the State, there was evidence to support the view that Defendant and Mora agreed to rob Baldenegro. In addition to other indications that they would harm Baldenegro if necessary, Defendant picked up the pipe outside of the apartment and gave it to Mora.

### CONCLUSION

{26} For the reasons discussed above, we reverse on issues one and three and affirm in all other respects. We remand with instructions to vacate that portion of the judgment and sentence that reduces good time credit for the conspiracy to commit armed robbery conviction, and to resentence Counts III and IV under Subsections 31–18–15A.

{27} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER, Chief Judge, and JONATHAN B. SUTIN, Judge.