2004-NMSC-033
99 P.3d 667

**STATE of New Mexico, Plaintiff–
Petitioner,**

v.

**Joseph McDONALD, Defendant–
Respondent.**

**No. 28,237.**

Supreme Court of New Mexico.

Sept. 23, 2004.

As Corrected Nov. 12, 2004.

Patricia A. Madrid, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, NM, for Petitioner.

John Bigelow, Chief Public Defender, Sheila Lewis, Assistant Appellate Defender, Santa Fe, NM, for Respondent.

## OPINION

BOSSON, Justice.

{1} In this opinion we decide whether sentencing under NMSA 1978, Section 31–

18–15(A)(2), -(4) (1999, prior to 2003 amendments) requires that a jury, and not the judge, determine whether the crime is one "resulting in the death of a human being." Applying *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), we conclude that the court erred in not submitting the question to the jury, but we also find the error harmless in the context of this case. Secondly, we hold that conspiracy is not an enumerated "serious violent offense" under the Earned Meritorious Deduction Act (EMDA), NMSA 1978, § 33–2–34(L)(4) (1999, prior to 2003 amendments), and therefore, conviction of conspiracy does not disqualify one for eligibility for good time credit for that resulting sentence. For the most part we affirm the Court of Appeals, but reverse its determination that the *Apprendi* error was not harmless.

## BACKGROUND

{2} Victim, a truck driver from California, met Defendant in a bar in Lordsburg, New Mexico on the evening of September 24, 1999. Victim and Defendant played pool and drank beer prior to accompanying Defendant's girlfriend, Onisha Aguilera, back to Aguilera's apartment. Defendant, Victim, and Aguilera used cocaine, and then Victim continued to drink until he fell asleep. Defendant and Aguilera left the apartment to procure more drugs, leaving Victim asleep in the apartment.

{3} Defendant and Aguilera met Lorenzo Mora after leaving the apartment. Defendant and Mora returned to Aguilera's apartment to get more money from Victim. According to one version of the evidence, upon arriving at the apartment Defendant picked up a large metal pipe and handed it to Mora. Mora proceeded to enter the bedroom where Victim was sleeping and hit Victim in the head, fracturing his skull twice. Expert testimony offered at trial proved that the attack ultimately caused Victim's death approximately two hours later. Defendant then removed approximately $180.00 from Victim's pocket. After leaving the apartment, Defendant and Mora rejoined Aguilera and traveled to Palomas, Mexico.

{4} Defendant, Mora, and Aguilera were apprehended ten days later upon their re-entry into the United States. At trial, Defendant faced charges of felony murder, or in the alternative, second degree murder (Count I), conspiracy to commit felony murder, or in the alternative, conspiracy to commit second degree murder (Count II), armed robbery (Count III), and conspiracy to commit armed robbery (Count IV). The jury was unable to decide on a verdict with respect to Counts I and II, but returned guilty verdicts on Counts III and IV. The district court declared a mistrial on Counts I and II, but did not poll the jury.

{5} In sentencing Defendant for his convictions on Counts III and IV, the district court imposed sentences that pertain to second and third degree felonies "resulting in the death of a human being" under Section 31–18–15(A)(2), -(4) (fifteen years and six years respectively), instead of the sentences corresponding to generic second and third degree felonies without the nexus to a death under Section 31–18–15(A)(3), -(5) (nine and three years respectively). With other aggravating factors and habitual offender considerations, Defendant was sentenced to a total of thirty-six years. The district court also restricted the good time credit available to Defendant while incarcerated under the EMDA which limited good time credit eligibility for certain violent crimes.

{6} On appeal to the Court of Appeals, Defendant argued that, under *Apprendi*, any penalty beyond the basic sentence applicable to generic second and third degree felonies must be determined by a jury, properly instructed to decide whether the crimes "result[ed] in the death of a human being," and not by the sentencing judge. Defendant also argued that the court could not reduce his good time eligibility under the EMDA for the conspiracy conviction, because conspiracy was not an enumerated crime under that statute. Defendant raised other issues not relevant to this opinion. The Court of Appeals agreed with Defendant in regard to the *Apprendi* issue, and overturned the sentences imposed by the sentencing judge. *State v. McDonald*, 2003–NMCA–123, ¶¶ 7–17, 134 N.M. 486, 79 P.3d 830. The Court also agreed with Defendant that his conviction for conspiracy did not authorize the dis-

trict court to limit good time eligibility under the EMDA. *Id.* ¶ 20. We granted the State's petition for certiorari to review these two questions.

## DISCUSSION

▇ {7} Prior to the 2003 amendments, which do not apply to this case, Section 31–18–15(A) of the Criminal Sentencing Act provides in pertinent part:

If a person is convicted of a noncapital felony, the basic sentence of imprisonment is as follows:

. . .

(2) for a second degree felony resulting in the death of a human being, fifteen years imprisonment;

(3) for a second degree felony, nine years imprisonment;

(4) for a third degree felony resulting in the death of a human being, six years imprisonment;

(5) for a third degree felony, three years imprisonment;

. . . .

As is evident from the language of the statute, the legislature has chosen one basic sentence for generic second and third degree felonies, and a different basic sentence with a greater penalty when an additional fact is found: a crime "resulting in death." The State argues that this additional fact can be found by the sentencing court instead of the jury, and that the Court of Appeals misinterpreted both *Apprendi* and the Criminal Sentencing Act. On this point, we agree with our Court of Appeals.

▇ {8} In *Apprendi*, the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348; *see also Blakely v. Washington,* —— U.S. ——, ——, 124 S.Ct. 2531, 2537, 159 L.Ed.2d 403 (2004) ("When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment. . . ." (Internal quotation marks and citation omitted.)). In this case, the jury found

Defendant guilty of armed robbery and conspiracy to commit armed robbery; the jury was not instructed to find whether the crimes resulted in death and did not do so. Instead, the trial court made the finding that the crimes resulted in death; this finding triggered the different basic sentences, with higher punishment, as set forth in Section 31–18–15(A)(2), -(4). It is clear under *Apprendi* and *Blakely,* that the jury, and not the judge, must find "all the facts which the law makes essential to the punishment." *Blakely,* 124 S.Ct. at 2537. We affirm this portion of the Court of Appeals opinion. However, error in failing to instruct the jury on an element, even constitutional error founded on *Apprendi,* is subject to an analysis for harmless error.

### Harmless Error

▇ {9} The State urges this Court to find any sentencing error harmless because, even if properly instructed, no reasonable juror could ever have concluded that Defendant's armed robbery did not result in Victim's death. The State also points out, and correctly so, that Defendant has never contested this fact. Because this appeal does not involve a structural error, such as the complete denial of counsel or a biased trial judge, we apply the constitutional harmless error analysis described in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and *Neder v. United States,* 527 U.S. 1, 7–8, 15–16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). In *Neder,* the U.S. Supreme Court applied a harmless error review to jury instructions that omitted an element of the crime. *Apprendi*-type error is similar to the error at issue in *Neder;* it concerns elements omitted from the jury instructions. Not surprisingly, therefore, numerous courts have applied *Neder* harmless error analysis to *Apprendi* errors. *See State v. Gordon,* 262 Wis.2d 380, 663 N.W.2d 765, 776 (2003) (*"Neder's* harmless error analysis has been applied to *Apprendi*-type errors in every single federal appellate circuit." (Collecting cases.)).

▇ {10} Recent cases from this Court observe that, although the U.S. Supreme Court has articulated the *Chapman* harmless

error standard in different ways, the central focus of the harmless error inquiry has endured. *See State v. Alvarez–Lopez,* 136 N.M. 309, ¶ 27, 98 P.3d 699 (2004); *State v. Johnson,* 136 N.M. 348, ¶ 10, 98 P.3d 998 (2004). The constitutional harmless error inquiry requires us to determine "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Neder,* 527 U.S. at 15, 119 S.Ct. 1827 (quoting *Chapman,* 386 U.S. at 24, 87 S.Ct. 824). In *Neder,* which involved a failure to instruct the jury on an element of the crime—as opposed to an error in admitted evidence, as in *Chapman*—the court focused its harmless error analysis upon whether the omitted element was uncontested and whether it was supported by overwhelming evidence. *Neder,* 527 U.S. at 17, 119 S.Ct. 1827. We have also cautioned that "the reviewing court must ever bear in mind that criminal defendants have a constitutional right to have a jury decide guilt or innocence, not appellate court judges during review on appeal." *Johnson,* 136 N.M. at ¶ 10, 98 P.3d 998 (internal citations omitted).

{11} In applying harmless error analysis under *Neder* to this case, we agree with the State that *United States v. Friedman,* 300 F.3d 111 (2d Cir.2002), *cert. denied,* 538 U.S. 981, 123 S.Ct. 1785, 155 L.Ed.2d 672 (2003), is persuasive authority. In *Friedman,* the defendants were convicted of numerous crimes, including interstate travel in aid of racketeering ("ITAR"), for their involvement with drug trafficking, extortion, and kidnaping. *Id.* at 114–15. Although the kidnaping victims were killed, the defendants were never charged with their murder. After the jury found the defendants guilty, the court then made its own determination that the ITAR crimes resulted in the death of the victims and imposed heightened sentences pursuant to statute. *Id.* at 119–20. On appeal, the court recognized the *Apprendi* problem. Applying *Neder,* however, the Court found the error harmless in light of the evidence in the record. "On the evidence of record, no reasonable jury could have found the Friedmans guilty beyond a reasonable doubt of the ITAR crimes—as the jury did in this case—and simultaneously found that the Friedmans were not responsible for

the deaths of [the victims]." *Friedman,* 300 F.3d at 128.

{12} Applying *Friedman* and *Neder* to this case, we conclude that the court's *Apprendi* error was harmless in this instance. Just as in *Friedman,* the overwhelming evidence in this case, essentially uncontested at trial, led inescapably to the conclusion that Victim's death resulted from the armed robbery. According to that evidence, Defendant participated in the armed robbery of Victim; during the robbery Victim was beaten in the head with a metal pipe and suffered a fractured skull; Victim died soon thereafter from his injuries. There was no evidence of another cause of death. Significantly, Defendant never disputed at trial that the armed robbery resulted in Victim's death.

{13} On this evidence, no rational jury could have found Defendant guilty of armed robbery and conspiracy to commit armed robbery—as the jury did in this case—and not have found that Victim's death resulted from those crimes. We can safely conclude beyond any reasonable doubt "that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." *Neder,* 527 U.S. at 17, 119 S.Ct. 1827.

{14} We note that the degree of Defendant's participation in those crimes is immaterial. Because Defendant participated in armed robbery, he can be sentenced for the death that resulted from the robbery. The State correctly notes that accessory liability in New Mexico is equal to that of the principal. *State v. Carrasco,* 1997–NMSC–047, ¶ 6, 124 N.M. 64, 946 P.2d 1075.

{15} Defendant, tracking the reasoning of the Court of Appeals, reminds us that the jury in this case was unable to reach a verdict on the charges of murder and conspiracy to commit murder. Defendant relies on that jury failure as evidence of reasonable doubt as to whether the jury would have found that the armed robbery and conspiracy resulted in Victim's death. In articulating this argument, and distinguishing *Friedman,* the Court of Appeals stated:

Here, the jury in fact failed to find Defendant guilty of felony murder or second degree murder and their accompanying conspiracy counts. To find that Defendant's acts in connection with the more attenuated armed robbery resulted in the victim's death is not consistent with the jury's failure to find him guilty of the death directly. The jury's failure to convict Defendant of a crime that would have found him responsible for the death argues against the district court's action and brings into clear relief the constitutional underpinnings of *Apprendi*.

*McDonald*, 2003–NMCA–123, ¶ 15, 134 N.M. 486, 79 P.3d 830.

{16} We disagree with the Court of Appeals on this point. The elements required for a murder conviction are more numerous and far more nuanced than the one straightforward element necessary to sentence one for a crime that "resulted in death." Lack of jury consensus as the former creates no fair inference as to the latter. For example, to find that a crime "results in death" under the sentencing statutes does not require the jury to decide, as with a murder instruction, that the accused intended the killing to take place or was otherwise responsible for circumstances that made death or bodily harm likely.

{17} In this case, in regard to the *mens rea* necessary for felony murder, the jury was instructed to find whether Defendant "intended the killing to occur or knew that he was helping to create a strong probability of death or great bodily harm," in addition to the other elements of the crime. The jury was further instructed that if, in the alternative, it were to find Defendant guilty of second degree murder, it must find that Defendant "knew that his acts created a strong probability of death or great bodily harm" to Victim. *See* UJI 14–211 NMRA 2004; *see also* NMSA 1978, § 30–2–1(B) (1994). Likewise, the crimes of conspiracy to commit felony murder and conspiracy to commit second degree murder have a *mens rea* requirement that the accused must intend to commit the crime. NMSA 1978, § 30–28–2 (1979). In this case, there was conflicting evidence regarding Defendant's participation in the murder and Defendant's own *mens rea*, and the jury could not agree on a verdict.

{18} In contrast, the sentencing statute, Section 31–18–15(A)(2), -(4), contains no *mens rea* requirement. The clear language of the statute requires only the factual consequence of a crime resulting in death. *State v. Shije*, 1998–NMCA–102, ¶¶ 6, 9, 125 N.M. 581, 964 P.2d 142. "We can discern a reasonable legislative objective from the language of Section 31–18–15(A)(2). Namely, it is to prevent crimes that result in people's deaths." *Shije*, 1998–NMCA–102, ¶ 9, 125 N.M. 581, 964 P.2d 142 (citation omitted). An accused need not intend the result, or even directly cause the result. The result need not be foreseeable. Here, the jury convicted Defendant of armed robbery; and death was undeniably the result. No reasonable juror could have failed to agree. In this respect, therefore, we reverse the Court of Appeals as to the effect of *Apprendi* error below.

**Good Time Credit**

{19} The Court of Appeals held that Defendant's conviction for conspiracy to commit armed robbery (as opposed to the armed robbery itself) did not disqualify him from eligibility for good time credit under the EMDA. The State argues that the Court of Appeals misconstrued the EMDA in light of its scope and purpose. The State urges this Court instead to find that conspiracy to commit any mandatory EMDA offense, as defined in Section 33–2–34(L)(4)(a)–(m), should be treated no differently from the underlying offense which is the object of the conspiracy.

{20} The Court of Appeals correctly described the EMDA as a "carefully structured" law, designed to reduce good time eligibility for prisoners convicted of certain enumerated, "serious violent offenses" such as murder and armed robbery. *See* § 33–2–34(L)(4)(a)–(m). Section 33–2–34(L)(4)(n), in turn, enumerates a subset of discretionary offenses which may, under certain circumstances, also constitute serious violent offenses. These circumstances were described in *State v. Morales*, 2002–NMCA–123, ¶ 16, 131 N.M. 530, 39 P.3d 747 as discretionary crimes committed in a "physically violent

manner either with an intent to do serious harm or with recklessness in the face of knowledge that one's acts are reasonably likely to result in serious harm." Section 33–2–34(L)(3), which defines nonviolent offenses, on the other hand, does not list those offenses which are nonviolent, but instead uses a general definition: "*any* offense other than a serious violent offense." (Emphasis added.) Thus, under the structure created by the legislature in Section 33–2–34, mandatory "serious violent offenses" are those listed in Section 33–2–34(L)(4)(a)–(m), discretionary "serious violent offenses" are those listed in Section 33–2–34(n), and *any* other offense is a "nonviolent offense."

{21} None of these enumerated crimes, either mandatory or discretionary, include conspiracy. The State nonetheless argues that the purpose of the EMDA is to deter violent crime by reducing the good time credit available to those convicted of any crime of serious violence, and thus reaches beyond the explicitly enumerated crimes to achieve its purpose. According to the State's argument, Defendant's agreement to commit an armed robbery, ultimately resulting in death, falls within the purview of the EMDA because it satisfies the same legislative purpose and policy goals of deterring violent crime.

{22} We take no position on the State's policy arguments. It is profoundly a matter for the legislature to determine whether the agreement to commit a violent crime is to be treated the same as the underlying crime itself. *Torres v. State,* 119 N.M. 609, 612, 894 P.2d 386, 389 (1995) ("[I]t is the particular domain of the legislature, as the voice of the people, to make public policy."). The legislature has evinced its intent to treat the crime of conspiracy differently when it decided that conspiracy is to be punished less harshly than the underlying offense. *See* NMSA 1978, § 30–28–1 (1979) (establishing that conspiracy to commit a felony is to be punished as a crime one degree lower than the degree of the underlying felony); *cf.* NMSA 1978, § 30–28–1 (1963) (treating attempt in a similar manner). The wisdom of this policy decision is not our concern. *See McGeehan v. Bunch,* 88 N.M. 308, 310, 540 P.2d 238, 240 (1975).

{23} In the absence of legislative direction, we look to the basic rules of statutory interpretation and conclude that the statute is clear as presently written. The legislature has undertaken considerable effort to differentiate between crimes, and select from among them the ones it determined to be the worst. It has enumerated those select crimes and declared its collective will. Punishment for those crimes is now longer and more severe. We will not second-guess a clear legislative choice. If conspiracy belongs within that select class of crimes, the legislature can make it so. Until then, conspiracy is not so enumerated, and those convicted of conspiracy are not disqualified from good time eligibility under the EMDA. We affirm the Court of Appeals.

## CONCLUSION

{24} We find the *Apprendi* sentencing error to be harmless and reverse the Court of Appeals to this limited extent. In all other respects, the opinion of the Court of Appeals is affirmed.

{25} **IT IS SO ORDERED.**

WE CONCUR: PETRA JIMENEZ MAES, Chief Justice, PAMELA B. MINZNER, PATRICIO M. SERNA, and EDWARD L. CHAVEZ, Justices.